UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUDITH F.,[1]

     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

Case No. 2:21-cv-10712
District Judge Linda V. Parker
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

### I.    Introduction

This is a social security case. Plaintiff Judith F. brings this action under 42 U.S.C. § 405(g), challenging the final decision of defendant Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act (the Act). Both parties have filed summary judgment motions, (ECF Nos. 24, 25), which have been referred to the undersigned for a Report and

_____

[1] Consistent with guidance regarding privacy concerns in Social Security cases by the Judicial Conference Committee on Court Administration and Case Management, this district has adopted a policy to identify plaintiffs by only their first names and last initials. *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

1

Recommendation under 28 U.S.C. § 636(b)(1)(B), (ECF No. 9).  For the reasons

set forth below, the undersigned RECOMMENDS that Plaintiff's motion, (ECF

No. 24), be GRANTED to the extent that she requests remand; the Commissioner's

motion, (ECF No. 25), be DENIED; and the case be REMANDED in order for the

administrative law judge (ALJ) to reassess the medical opinion of Plaintiff's

treating physician Bhramaramba Sarvepalli, M.D. (Dr. Sarvepalli) in a manner that

satisfies 20 C.F.R. § 404.1520c, and allows the reviewing court to properly review

his evaluation.

## II.     Background

### A.     Procedural History

Plaintiff was 50 years old at the time of her alleged onset date of July 17,

2017.  (ECF No. 23, PageID.212, 222).  She has at least a high school education

and past relevant work in assembly production, inspection, and customer service.

(*Id.*, PageID.162, 219, 229).  Plaintiff alleges disability due to arthritis in her back,

degenerative disc disease (disc protrusion/bulge), and tailbone misplacement.  (*Id.*,

PageID.213, 223).

On May 18, 2018, Plaintiff filed applications for DIB and SSI.  (*Id.*,

PageID.213, 223).  Her applications were initially denied on August 8, 2018.  (*Id.*,

PageID.232, 234).  Plaintiff timely requested an administrative hearing, which was

held before the ALJ on October 11, 2019.  (*Id.*, PageID.170).  Plaintiff testified by

2

video at the hearing, as did a vocational expert.  (*Id.*, PageID.174-210).  Plaintiff offered the following testimony.

Plaintiff lived in an apartment with her adult daughter and nearby to her adult son who both assisted her when she needed help.  (*Id.*, PageID.182-183, 198-199).  Plaintiff graduated from high school and completed two years of college but did not earn a degree.  (*Id.*, PageID.175).  At the time of the hearing, she was working part-time at a medical parts factory.  (*Id.*, PageID.175-176).

Plaintiff believed that she was disabled because of back issues and a torn ACL in her right knee.  (*Id.*, PageID.176, 187).  Her back had been bothering her for years, including her tailbone and right shoulder, but she tried to continue working fulltime for as long as she could.  (*Id.*, PageID.176, 183, 185).  The shoulder pain caused Plaintiff to suffer from one or two bad headaches a week, which she treated with Motrin.  (*Id*., PageID.191-192, 196).  Her torn ACL made it difficult for her to stand for too long.  (*Id.*, PageID.176).  She was prescribed a brace to keep her right knee in the correct position.  (*Id.*, PageID.189).

Plaintiff's prior fulltime work as an assembler and inspector required her to stand all day.  (*Id.*, PageID.177-180).  Her impairments made it difficult to stand, lift, and bend as required to perform her past jobs.  (*Id.*, PageID.183).  Lifting around three pounds at her current parttime job caused Plaintiff back pain.  (*Id*., PageID.188).

Plaintiff also struggled with dizzy spells and anxiety.  (*Id.*, PageID.192-195).
She experienced dizzy spells a couple of times a month.  (*Id.*, PageID.193).  If she
experienced one at work, she took a short break.  (*Id.*).  Plaintiff had recently
started experiencing daily anxiety attacks that lasted for about five minutes.  (*Id.*,
PageID.193-194).  Sometimes they were brought on by stress, but at other times
they occurred suddenly, without explanation.  (*Id.*).  Plaintiff was seeing a
counselor approximately twice a month.  (*Id.*, PageID.194-195).

On December 3, 2019, the ALJ issued a written decision finding that
Plaintiff was not disabled.  (*Id.*, PageID.151-168).  On January 28, 2021, the
Appeals Council denied Plaintiff's request for review, (*id.*, PageID.139-143),
making the ALJ's decision the final decision of the Commissioner.  Plaintiff timely
filed for judicial review of the final decision.  (ECF No. 1).

### B.     Medical Evidence[2]

### 1.     Primary Care Records

Plaintiff regularly treated with Dr. Sarvepalli, Brent Boggess, M.D. (Dr.
Boggess), and Raghu Sarvepalli, M.D. (Dr. Raghu Sarvepalli) of Heritage Family

---

[2] Many of the medical records predate Plaintiff's alleged onset date of July 17,
2017.  These records are omitted from the following summation of the medical
evidence because they fall outside of the relevant period.  *See, e.g.*, *Lowery v.
Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 716 n.8 (S.D. Ohio 2012) ("In
determining whether a Plaintiff is 'disabled,' the ALJ generally only considers
evidence from the alleged disability onset date through the date last insured.").

Physicians.

At an August 1, 2017 appointment with Dr. Sarvepalli, Plaintiff reported that she continued to experience back pain due to bulging discs. (ECF No. 23, PageID.532). Plaintiff also told Dr. Sarvepalli that she had gotten in trouble at work for taking too much time off because of her pain. (*Id.*). Plaintiff rated her average back pain as an eight out of ten. (*Id.*).

On October 12, 2017, Plaintiff had an appointment with Dr. Sarvepalli to follow up on her back pain after completing physical therapy and not experiencing "a whole lot of improvement." (*Id.*, PageID.529). Dr. Sarvepalli believed that Plaintiff had degenerative disc disease and listed osteoarthritis as a differential diagnosis. (*Id.*, PageID.531). She noted that Plaintiff's "pain control has been deteriorating." (*Id.*). Dr. Sarvepalli recommended that Plaintiff continue taking prescription Motrin and consider both manipulation and taking disability leave from work. (*Id.*).

On December 19, 2017, Plaintiff presented to an appointment with Dr. Boggess for an evaluation of her neck pain that had begun about one week prior. (*Id.*, PageID.526). On physical examination, Dr. Boggess noted that Plaintiff had "slight tenderness which seem[ed] to start [at] the right occiput and radiate[] down into the trapezius." (*Id.*, PageID.527). He also noted that she had "slight discomfort with rotating to the neck." (*Id.*). Dr. Boggess assessed her with

5

torticollis[3] and recommended treating with Motrin, heat, and ice.  (*Id.*).

At a January 19, 2018 appointment with Dr. Sarvepalli, Plaintiff complained of right shoulder pain that she had been experiencing for about a year.  (*Id.*, PageID.523).  She also reported that she continued to suffer from back pain.  (*Id.*).  On physical examination, Dr. Sarvepalli noted that range of motion of the right shoulder was painful.  (*Id.*, PageID.524).

On February 28, 2018, Plaintiff presented to Dr. Sarvepalli for an initial evaluation of neck pain.  (*Id.*, PageID.520).  Plaintiff reported that she was trying to return to work but was unable to because she continued to struggle with pain in her low back and right shoulder.  (*Id.*).  The neck pain began two days prior, and Plaintiff rated her current right shoulder pain as a seven out of ten and getting worse.  (*Id.*).

On physical examination, Dr. Sarvepalli noted the following: "Cervical Spine: Appearance: <u>decreased lordosis</u>, but no deformity.  Palpatory findings include <u>bilateral muscle spasms</u>.  Flexion <u>was restricted</u>."  (*Id.*, PageID.521).  She also noted "pain over trapezius."  (*Id.*).

On August 17, 2018, Plaintiff presented to Dr. Raghu Sarvepalli

---

[3] "Torticollis, also known as wryneck, is a twisting of the neck that causes the head to rotate and tilt at an odd angle."
https://www.hopkinsmedicine.org/health/conditions-and-diseases/torticollis-wryneck (last visited Feb. 10, 2024).

6

complaining of worsening back pain that included "stiffness, decreased spine range of motion, decreased flexion, decreased extension, decreased lateral bending, decreased rotation, lower extremity numbness and lower extremity tingling, but no lower extremity weakness." (*Id.*, PageID.673).  Plaintiff rated her pain as a seven out of ten.  (*Id.*).  On physical examination, Dr. Raghu Sarvepalli noted that Plaintiff's "gait is somewhat limiting" and that her "[s]traight leg raising on the right side is about 60 [and] left side is 90." (*Id.*, PageID.674).

At a September 5, 2018 appointment with Dr. Raghu Sarvepalli, Plaintiff reported that she continued to experience lower back and lumbar pain. (*Id.*, PageID.670).  On physical examination, Dr. Raghu Sarvepalli noted that Plaintiff's gait and station were normal but that she had limited forward flexion of the lumbar spine. (*Id.*, PageID.671).  He ordered an MRI to better assess Plaintiff's back. (*Id.*, PageID.672).

A September 11, 2018 MRI of Plaintiff's lumbar spine revealed "disc desiccation from L3 through S1 area." (*Id.*, PageID.688).  A couple of areas of disc protrusion or bulging were also noted. (*Id.*, PageID.688-689).  The overall impression was as follows:

1.   No acute fracture or malalignment.

2.   Generally mild spondylotic changes without significant central canal or neural foraminal stenosis.

(*Id.*, PageID.689).

On February 4, 2019, Plaintiff presented to Dr. Sarvepalli complaining of right shoulder pain that had flared up approximately six weeks prior. (*Id.*, PageID.664). Plaintiff had participated in physical therapy about a year prior for this pain and the pain had improved. (*Id.*).

At an April 3, 2019 appointment with Dr. Sarvepalli, Plaintiff complained of right knee pain for which she had been seen by an orthopedic specialist. (*Id.*, PageID.656). Her symptoms included "swelling, stiffness, decreased range of motion, locking, instability and difficulty ambulating[.]" (*Id.*). Dr. Sarvepalli noted that Plaintiff was walking with a limp. (*Id.*, PageID.658).

On June 27, 2019, Plaintiff presented to Dr. Raghu Sarvepalli complaining of hip pain that began after an incident at physical therapy about three months prior as well as dizziness. (*Id.*, PageID.652). Dr. Raghu Sarvepalli noted that Plaintiff's gait was normal and that she was wearing a knee brace on her right knee. (*Id.*, PageID.653).

### 2. Physical Therapy Records

Plaintiff participated in multiple courses of physical therapy following her alleged onset date.

From August 17, 2017 through October 4, 2017, Plaintiff participated in a total of sixteen sessions of physical therapy to treat her low back pain. (ECF No. 23, PageID.537-539). Following this course of physical therapy, Plaintiff's

8

physical therapist noted that she had "not made many gains since starting treatment in stability, pain levels or functional abilities." (*Id.*, PageID.538).

On March 22, 2018, Plaintiff began participating in physical therapy three times a week for a period of five weeks. (*Id.*, PageID.534-536). On initial evaluation, her physical therapist observed the following: "Neck, upper back, mid back and [right] upper extremity pain; decreased strength cervical, parascapulars, B upper extremities; poor posture; joint and soft tissue restrictions; decreased mobility thoracic spine." (*Id.*, PageID.535).

On April 15, 2019, Plaintiff began a new course of physical therapy that was scheduled to occur two to three times a week for a period of four weeks. (*Id.*, PageID.639-642). On initial evaluation, her physical therapist observed the following: Plaintiff "demonstrates pain in the right lower extremity, limited right knee extension, weakness in bilateral lower extremities (left> right), weakness in abdominals/core, weakness in bilateral hips/glutes, impaired balance, and impaired ambulation." (*Id.*, PageID.641). Plaintiff's physical therapist discharged her on June 3, 2019, because Plaintiff had not contacted the office in over thirty days. (*Id.*, PageID.646). While she was attending services, it was noted that Plaintiff's "[p]ain was limiting [her] tolerance to all standing, sitting, and ambulatory/functional activities at home." (*Id.*).

### 3.     Orthopedic Records

Throughout 2019, Plaintiff saw orthopedic specialists regarding her right shoulder and right knee pain.

On February 14, 2019, Plaintiff began treating with Pervez Yusaf, M.D. (Dr. Yusaf) for her right shoulder pain that had been ongoing for about three years. (ECF No. 23, PageID.556-557).  She reported that her pain was a nine out of ten at its worst and a two out of ten at its best.  (*Id.*, PageID.556).  She also reported that a prior course of physical therapy helped improve her range of motion and strength but did not reduce her pain.  (*Id.*).  On examination, Dr. Yusaf noted "weakness of the rotator cuff in forced external rotation and forced abduction."  (*Id.*, PageID.557).  The impingement test was also positive.  (*Id.*).  An ultrasound revealed a supraspinatus tear.  (*Id.*).  Dr. Yusaf recommended that Plaintiff undergo an MRI of her right shoulder.  (*Id.*).

On March 5, 2019, Plaintiff presented to Dr. Yusaf to review a recent MRI of her right shoulder.  (*Id.*, PageID.554-555).  Plaintiff reported that at its worst her shoulder pain was a nine out of ten and at its best it was a three out of ten.  (*Id.*, PageID.554).  The MRI revealed tendinitis of the supra- and infraspinatus tendons as well as nonspecific abnormality near the biceps tendon and attachment of the glenoid.  (*Id.*, PageID.555).  Dr. Yusaf opined that Plaintiff "could benefit from arthroscopy, decompression, and inspection of the supra- and infraspinatus tendons

and biceps tendon." (*Id.*).

At her March 12, 2019 appointment with Dr. Yusaf, Plaintiff reported

twisting her right knee[4] and experiencing pain since. (*Id.*, PageID.552-553).

Plaintiff rated her pain as a six out ten and reported that she only felt relief when

she elevated her knee. (*Id.*, PageID.552). Dr. Yusaf assessed Plaintiff with a right

knee sprain and ordered an MRI to rule out something more serious. (*Id.*,

PageID.553).

On April 4, 2019, Plaintiff presented to Dr. Yusaf to review a recent MRI of

her right knee. (*Id.*, PageID.550-551). Plaintiff reported continued swelling in her

knee and noted pain that was at best a two out of ten and at worst a six out of ten.

(*Id.*, PageID.550). The MRI revealed an ACL tear, a contusion of the lateral tibial

condyle, and possibly a minimal compression of the bone. (*Id.*, PageID.551). Dr.

Yusaf wanted to send Plaintiff to "physical therapy and a muscle strengthening

program" before considering ACL repair. (*Id.*). He also recommended a knee

immobilization device. (*Id.*).

---

[4] On March 2, 2019, Plaintiff presented to an emergency department complaining
of ten out of ten right knee pain that began "after she slipped on the ice while [she]
cleared off her car this morning." (ECF No. 23, PageID.608). An x-ray did not
reveal any acute fractures or dislocation. (*Id.*, PageID.609). Plaintiff was given
Toradol and Tylenol to relieve her pain. (*Id.*). Four days later, Plaintiff followed
up with Dr. Sarvepalli and reported that her symptoms remained largely the same.
(*Id.*, PageID.660). Dr. Sarvepalli referred Plaintiff to Dr. Yusaf for further
evaluation. (*Id.*, PageID.662).

On April 30, 2019, Plaintiff returned to Dr. Yusaf for an x-ray of her right knee. (*Id.*, PageID.547-549). At its best, the pain was a three out of ten; at its worst, it was a nine out of ten. (*Id.*, PageID.547). Dr. Yusaf felt that "all-in-all her knee is better than before." (*Id.*, PageID.548). He noted that the only thing that could be done was to refer Plaintiff to a surgeon for consideration of ACL repair. (*Id.*).

On May 8, 2019, Plaintiff presented for an initial evaluation of her right knee by Michael Wolohan, M.D. (Dr. Wolohan). (*Id.*, PageID.695). Dr. Wolohan discussed treatment options with Plaintiff and opined that "[b]ecause of her history of back trouble he advised against a surgery at this point," and he was "not convinced that an ACL reconstruction would benefit her much." (*Id.*, PageID.697). He recommended that Plaintiff obtain "an ACL sport specific knee brace" and return for a follow-up visit in six weeks. (*Id.*).

Plaintiff returned to Dr. Wolohan on June 19, 2019, for a follow-up appointment. (*Id.*, PageID.707). She reported that she had stopped attending physical therapy due to back and hip pain and that she had been wearing the ACL brace only when ambulating in public. (*Id.*). On physical examination of Plaintiff's right knee, Dr. Wolohan noted the following: "Stable gait free of cane or crutch, good extension, no effusion, good flexion and extension, some play on Lachmans but seems to have a good end point, stable to varus and valgus stress,

good distal pulse and neuromotor exam intact." (*Id.*, PageID.708).  Dr. Wolohan

continued to advise against an ACL reconstruction because he was "not confident

that it will improve her pain and discomfort." (*Id.*).  He explained to Plaintiff that

"she does not need an ACL to walk, swim or bike ride." (*Id.*).  He recommended

that she seek a second opinion from James Jesko, D.O. (Dr. Jesko).  (*Id.*).

On July 8, 2019, Plaintiff presented to Dr. Jesko to obtain a second opinion

regarding treatment options for her right knee.  (*Id.*, PageID.712).  On physical

examination, Dr. Jesko noted the following:

> Right knee exam reveals no effusion.   Slight valgus alignment.
> Discomfort at the last 5' of extension.   Skin is cool and dry.   Full
> flexion.  +1 Lachman's.  Good stability to varus and valgus pressure
> with some discomfort with both.  Mcmurray's causes pain but no click.
> +1 Drawer.   Tender on the medial joint space.   Straight leg raise is
> negative.  Distal pulse is good.

(*Id.*, PageID.713).  Dr. Jesko opined that he was concerned about performing an

ACL reconstruction "due to her age, preexisting knee problems, and back

problems[.]" (*Id.*, PageID.714).  He noted that Plaintiff's "back problems will

likely affect her ability to perform post op recovery and therapy." (*Id.*).  Dr. Jesko

recommended that Plaintiff continue wearing the ACL brace to see if that was

enough to keep her knee pain under control; if it was not, operative treatment could

be considered.  (*Id.*).

III.   Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a

"disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act

defines "disability" as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The

Commissioner's regulations provide that a disability is to be determined through

the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D.

Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff was not disabled under the Act. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 17, 2017, her alleged onset date. (ECF No. 23, PageID.157). At Step Two, the ALJ found that she had the severe impairments of disorder of the thoracic and lumbar spines, disorder of the right shoulder, and disorder of the right knee. (*Id.*). At Step Three, the ALJ found that none of Plaintiff's impairments met or medically equaled a listed impairment. (*Id.*, PageID.158).

The ALJ then assessed Plaintiff's residual functional capacity, concluding that she was capable of performing light work, except that she could

> lift and carry 10 pounds frequently and 20 pounds occasionally; stand or walk, with normal breaks, for 6 hours in an 8-hour workday; sit, with normal breaks, for 6 hours in an 8-hour workday; push or pull within the aforementioned weight restrictions; frequently balance or stoop; occasionally kneel, crouch, crawl, or climb; occasionally have exposure to extreme cold, vibration, unprotected heights, or moving mechanical parts; occasionally reach overhead, and frequently reach in all other directions, with the right, dominant upper extremity; and occasionally

15

operate foot controls with the right lower extremity.

(*Id.*, PageID.158).

At Step Four, the ALJ found that Plaintiff was capable of performing past relevant work as an assembler and inspector.  (*Id.*, PageID.162).  As a result, the ALJ concluded that Plaintiff was not disabled under the Act.  (*Id.*, PageID.164).

IV.    Standard of Review

A district court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although a court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224-25 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence."  42 U.S.C. § 405(g).  The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) (" 'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.' " (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that

17

would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal

quotation marks and citation omitted).  Finally, even if the ALJ's decision meets

the substantial evidence standard, "a decision of the Commissioner will not be

upheld where the [Social Security Administration (SSA)] fails to follow its own

regulations and where that error prejudices a claimant on the merits or deprives the

claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009) (internal quotation marks and citations omitted).

V.    Analysis

A.    Parties' Arguments

Plaintiff argues that the ALJ's decision is not supported by substantial

evidence because he failed to properly evaluate Dr. Sarvepalli's opinion under

current regulations.  In response, the Commissioner argues that the ALJ properly

evaluated Dr. Sarvepalli's opinion and that his decision is thus supported by

substantial evidence.

B.    Legal Standard

When evaluating a medical opinion, the ALJ must articulate "how

persuasive [he] find[s] all of the medical opinions and all of the prior

administrative medical findings in [the claimant's] case record."  20 C.F.R. §

404.1520c(b).  The ALJ evaluates the persuasiveness of the medical opinions and

prior administrative medical findings by utilizing the following five factors: (1)

18

supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors.  § 404.1520c(c).  Supportability and consistency are the most important factors and the ALJ must explain how he considered these factors in his decision.  § 404.1520c(b)(2).

### C.    Medical Opinion of Dr. Sarvepalli

#### 1.    Dr. Sarvepalli's Opinion

At issue is the ALJ's evaluation of Dr. Sarvepalli's Treating Source Statement – Physical Conditions dated November 7, 2019.  (ECF No. 23, PageID.731-735).

Dr. Sarvepalli described herself as Plaintiff's primary care physician and estimated that she had been treating Plaintiff for two and a half years with visits occurring approximately every one to three months.  (*Id.*, PageID.731).  She listed Plaintiffs' diagnoses as degenerative disc disease, chronic back pain, gastroesophageal reflux disease, chronic shoulder pain, knee pain, incontinence, labral tear of shoulder, onychomycosis, right ACL tear, skin lesions, torticollis, labyrinthitis, and cervicalgia.  (*Id.*).

Dr. Sarvepalli estimated that Plaintiff would be off task for more than 25% of a typical workday and would miss more than four workdays each month.  (*Id.*). She opined that Plaintiff could rarely lift due to spinal pain and would be able to stand/walk for less than an hour each workday due to knee pain.  (*Id.*, PageID.732).

Plaintiff needed to lie down with her legs elevated once during an eight-hour workday. (*Id.*).  Dr. Sarvepalli also indicated that Plaintiff required the use of a cane or other assistive device in order to ambulate effectively.  (*Id.*).

## 2.   ALJ's Evaluation

In his decision, the ALJ evaluated Dr. Sarvepalli's opinion as follows:

> This statement is unpersuasive as the limitations in this opinion are extreme and are not well supported by explanation.  The statement [is] inconsistent with a preponderance of the evidence including the imaging studies showing mild lumbar findings and the conservative treatment history of physical therapy.  Furthermore, the use of a cane was not supported by the examination findings that consistently showed [Plaintiff] to have a normal gait without the use of an assistive device.

(ECF No. 23, PageID.161 (internal record citation omitted)).

## D.   Application

The ALJ's cursory evaluation of Dr. Sarvepalli's opinion does not satisfy the articulation requirements of 20 C.F.R. § 404.1520c(b).

Under § 404.1520c(b)(2), the ALJ must specifically address the factors of supportability and consistency.  Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  § 404.1520c(c)(1).  Consistency means that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is

with the evidence from other medical sources and nonmedical sources in the claim,
the more persuasive the medical opinion(s) or prior administrative medical
finding(s) will be."  § 404.1520c(c)(2).  Further, the ALJ is required to provide a
"sufficiently detailed articulation of application of those factors in which the ALJ
must show their work, i.e., to explain in detail how the factors actually were
applied to each medical source."  *Huizar v. Comm'r of Soc. Sec.*, 610 F. Supp.
1010, 1020 (E.D. Mich. 2022) (cleaned up).  In other words, the regulations
"require that the ALJ provide a coherent explanation of his reasoning."  *Lester v.
Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020),
*report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, 2021
WL 119287 (N.D. Ohio Jan. 13, 2021).

While here the ALJ used phrases such as "not well supported" and
"inconsistent with a preponderance of the evidence," he did not explain in detail
how he applied the factors of supportability and consistency to Dr. Sarvepalli's
opinion.  Without a detailed explanation, "the ALJ has failed to set out a sufficient
analysis of the evidence to allow an appellate court to trace the path of [his]
reasoning."  *Farmer v. Comm'r of Soc. Sec.*, No. 1:20-cv-738, 2022 WL 842649, at
*4 (W.D. Mich. Mar. 22, 2022).  Instead, the ALJ leaves the Court guessing as to
what evidence he considered when discounting Dr. Sarvepalli's opinion.

Even though the ALJ said that the opinion was inconsistent with "a

preponderance of the evidence," his only support for this broad statement was "the imaging studies showing mild lumbar findings and the conservative treatment history of physical therapy." (ECF No. 23, PageID.161). The ALJ did not discuss the MRIs of Plaintiff's right shoulder (showing tendinitis of the supra- and infraspinatus tendons as well as nonspecific abnormality near the biceps tendon and attachment of the glenoid), (*id.*, PageID.555), or right knee (showing an ACL tear, a contusion of the lateral tibial condyle, and possibly a minimal compression of the bone), (*id.*, PageID.551) nor did he mention that Plaintiff was unable to continue participating in physical therapy due to back pain.

Ultimately, "the regulations [ ] require that the ALJ clearly explain his consideration of the opinions and identify the evidence supporting his conclusions[,]" and here, "the ALJ failed to fulfill that obligation with sufficient specificity to provide an accurate and logical bridge between the evidence and the resulting decision." *Lester*, 2020 WL 8093313, at *14. Contrary to the Commissioner's arguments on appeal, the ALJ was required to better articulate his reasons for discounting Dr. Sarvepalli's opinion. His failure to do so has left this Court unable to trace the path of his reasoning and determine whether his decision is supported by substantial evidence. Accordingly, this case should be remanded. On remand, the ALJ must reassess Dr. Sarvepalli's opinion in a manner that satisfies § 404.1520c, and allows the reviewing court to properly review his

evaluation.

## VI.    Conclusion

For the reasons stated above, the undersigned RECOMMENDS that

Plaintiff's motion, (ECF No. 24), be GRANTED to the extent that she requests a

remand; the Commissioner's motion, (ECF No. 25), be DENIED; and the case be

REMANDED as described above.

Dated: February 13, 2024                    s/Kimberly G. Altman
Detroit, Michigan                           KIMBERLY G. ALTMAN
                                            United States Magistrate Judge


## <u>**NOTICE TO PARTIES REGARDING OBJECTIONS**</u>

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 13, 2024.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager
